## VAN SLOOTEN *v.* WHEELER.

### *In re* DODGE'S ESTATE.

(*Supreme Court, General Term, Second Department.* July 2, 1891.)

**1. GIFTS—SURRENDER BY DONEE.**

On a reference to determine the validity of a claim against an executor to a diamond ring, it appeared that testator, before his death, delivered the ring to claimant, and declared to several persons that he had given it to her. Claimant remained in possession of the ring until testator's death, when she delivered it to the executor. As to the delivery to the executor, claimant testified that the executor asked to see it, and when she handed it to him he put it in his pocket and went away. The executor testified that, after testator's death, he told claimant that two certain persons were much incensed at her wearing the ring at the time of testator's death, and that it seemed that the proper thing for her to do was "to put it into the estate where it belongs;" whereupon claimant voluntarily handed the ring to him. *Held,* that claimant was entitled to the ring.

**2. CLAIMS AGAINST DECEDENT'S ESTATE—EVIDENCE.**

On the hearing of a claim against a testator's estate, it appeared that claimant had a mortgage for $20,000 on testator's property. The mortgaged property had been sold by testator, the mortgage released, and a check for $20,000 given by testator to claimant, but there was no evidence that either the mortgage or the check had been paid. There was evidence that testator had declared that he was going to sell the property and pay off claimant's mortgage, and that when he gave the check to claimant he told her to take care of it, and, if anything should happen to him, Mr. W., the executor, would attend to it. Claimant testified that after testator's death she gave to W. the check in question, saying that it was the check given her by testator, and that testator had told her to give it to W., who would attend to it for her. The executor, when called on to produce the check at the hearing, simply said, "We do not produce it," but did not say that it was not in his possession. *Held,* that the evidence was sufficient to establish the claim.

Appeal from judgment on report of referee.

Proceeding by Mary L. Van Slooten against Charles H. Wheeler, as executor of the will of Harry E. Dodge, deceased, to establish against testator's estate two claims, one for a diamond ring and the other for $20,000. The claim was disallowed, and the claimant appeals.

Argued before BARNARD, P. J., and DYKMAN and PRATT, JJ.

*Merritt E. Haviland,* for appellant. *Hubbard & Rushmore,* for respondent.

DYKMAN, J. Harry E. Dodge died in the city of Brooklyn on the 3d day of June, 1886, leaving a last will and testament, and after his death Mary L. Van Slooten, formerly Mary L. Miner, presented two claims against his estate to the executor of his will. One was a specific claim for a diamond ring, and the other was a claim for $20,000 and interest thereon from May 15, 1886. Both claims were rejected by the executor, and were thereafter referred to a referee for determination under the statute. The referee reported adversely to the claimant, and she has appealed from the judgment entered upon his report. The claimant based her claim to the ring upon a gift of the same to her by the deceased, and she gave evidence before the referee sufficient to establish a gift of the ring either *inter vivos* or *causa mortis.* The ring was delivered by the deceased to the claimant, and she retained the possession of it until after his death, without any revocation of the gift, and that was sufficient to vest the title to the same in her. He expressed his intention to make a gift of the ring to the claimant, and accompanied that expression by delivery, and that was sufficient to constitute a valid transfer of the property. *Bedell* v. *Carll,* 33 N. Y. 581; *Beaver* v. *Beaver,* 117 N. Y. 428, 22 N. E. Rep. 940. One of the witnesses, who was a mutual friend of the parties and a relative of the claimant, testified as follows, in respect to the presentation of the ring: "My cousin came into the room wearing the ring, and she showed it to me, and when Mr. Dodge came back she handed the ring to him, and he said, 'Look at me and smile;' and says, 'This ring is for May; it matches one of her ear-rings exactly. After a while I am going to get a ring, and have this made into an ear-ring; it matches hers.' He says, 'I am not going to live long; and, little old woman, it is for you; it is for you, whether it is made into an ear-ring or not.'" Subsequently the same witness stated: "I heard him say that the ring was hers; that he had given it to her, and that it was his intention to have it made into an ear-ring for her; and, if anything should happen to him, the ring was for May. The day we went to Coney Island, my cousin wore it that day." Another witness testified on the same subject: "The way I knew about the ring was that when I was there to ask about the money he put his hand up to his head. I said, 'Mr. Dodge, I would not mind having a ring like that,' or 'that ring,' and then he said it did not belong to him; 'it is May's.'" Another witness, Mrs. Halstead, testified she had often seen the claimant wearing the ring before Mr. Dodge's death, and she was then wearing it. Two other witnesses testified to the same effect. Another witness testified as follows: "While she [the claimant] was fixing his head, she put her hand out, [illustrating,]— her left hand,—to put her left hand on his head; and she said, 'See what a beautiful present I have had given me;' and he looked up and smiled. This was before the first attack of paralysis." The claimant testified, in her own behalf, that from the date of the ride to Coney Island, which was April 21, 1886, she kept the ring in her possession until after the testator's death. Another witness testified that she had seen the claimant wearing the ring for the first time, in Mr. Dodge's presence, about two months before his death. She last saw it on claimant's hand about a week before his death. After the death of the testator the claimant delivered the ring to the executor, and her version of the conversation which then occurred is as follows: "He then asked to 'see the ring I had on,' as he expressed it. I said, 'What ring?' He said, 'That;' pointing to this ring. I held up my hand, and he says, 'Take it off.' I took it off, and handed it to him, and then he called Mr. Wilcox, and left the house." She also testified that on several occasions she asked Mr. Wheeler if he would give her the ring.

and he said he would.　It appeared that she had through her attorney made a request of the executor for permission to purchase the ring, but that letter, and the circumstances under which it was written, was fully explained by the person who wrote it.

The foregoing testimony with respect to the gift of the ring was not contradicted, and the only contradictory evidence offered by the executor was his own version of the transaction, and the conversation at the time of the delivery of the ring to him.　In his testimony he says that, while calling at the house of the claimant, he took her into an adjoining room, and said to her: "May, there is a good deal of feeling existing in relation to your having possession of this ring.　Mrs. Morgan and Ned Dodge are very much incensed that you should be wearing it at the time of Mr. Dodge's death.　It seems to me it is the proper thing for you to do to put it into the estate, where it belongs;" and then he said "she voluntarily took it off her finger, and handed it to me, and I put it in my pocket, and we quietly bade her good evening, and left, and I put it into the inventory, as a part of the assets of the estate."　It is to be observed that the executor, according to his own version of the conversation, did not deny the right of the claimant to the ring, and he did not inform her that her right and title to the ring was questioned or denied by any one.　He simply stated to her that the two persons whom he named were incensed because she wore it at the time of the death of Mr. Dodge.　Her ownership was not denied or challenged in any way at that interview, and she delivered the ring to the executor, with the understanding on her part that it was to be returned to her again.　She did not indicate any intention to yield up her right to the ring or surrender her property therein.　She gave it to him voluntarily upon his demand, but that simple act, unaccompanied by any declaration of an intention to part with the same permanently, or to yield up her right to it, cannot be construed as a waiver of her claim or a surrender of any of her rights.　The uncontradicted testimony on the part of the claimant makes a plain case of a consummated gift which was sufficient to vest the title to the article in the claimant, and our conclusion is that the report of the referee was erroneous upon that question.

In relation to the claim of $20,000, it appeared that the claimant held a bond and mortgage of Mr. Dodge upon certain property of his in Brooklyn, for $20,000, payable on demand, which mortgage was satisfied of record on the 22d day of April, 1886; that the testator sold the premises after the same was so released from the mortgage on the 1st day of May, 1886; and it also appeared from the testimony, and was found by the referee, that between the 1st and the 12th days of May, 1886, the deceased, Harry E. Dodge, signed and delivered to the claimant his check for $20,000, payable to her order, under the name of Mary L. Miner.　It nowhere appeared that this check was ever paid. Neither did it appear that the bond and mortgage was paid, unless this check, made at that time, for the same amount, was given in payment of the same, which seems to us to be a reasonable inference, especially in view of the fact that, if the check of $20,000 had been paid, evidence of such payment might have been produced by the executor, who was in possession of the papers of the deceased.　In relation to this check, a significant fact occurred upon the trial before the referee, when the claimant's counsel called upon Mr. Wheeler to produce a certain check dated between the 1st and 12th of May, 1886, drawn to the order of Mary L. Miner, the claimant, and signed by Harry E. Dodge, called for in the notice to produce.　Due service of the notice was admitted, but the counsel for the executor stated, "We do not produce it." He did not say, "We cannot produce it, because it is not in our possession;" but his language is significant, and implied that he did not produce it because he would not, and not because he could not.　This occurrence upon the trial is rendered more significant when taken in connection with the testimony of

the claimant that she delivered the check to the executor, Mr. Wheeler, after the death of Mr. Dodge. The testimony upon this subject on the part of the claimant was this. The same mutual friend who gave evidence respecting the ring, a Miss Fitchett, stated that she visited the parties about the 1st of March, 1886, and that she had conversations with Mr. Dodge, in which he remarked "that my cousin had a mortgage on his Henry-Street house, and that he had an opportunity of selling the house, and he thought he would sell it and pay her the mortgage; spoke of that to me on several occasions." Again she says, in the second conversation, he said "that Mrs. Miner had a mortgage on the Henry-Street house, and that he had an opportunity to sell the house, and he thought he would do so, and pay her the mortgage; pay her the $20,000." Then she said the last conversation was: "One day he came home about one o'clock. My cousin was out. We were in the sitting-room alone for a long time. He spoke of the mortgage that day. * * * He remarked that he was going to sell the house to pay her the $20,000 mortgage." Another witness, who was a servant, and went to live in the family about the 6th of May, testified that one day he came upstairs, and heard Mr. Dodge say to Mrs. Miner: "I will give you the check, and, if anything should happen to me, you can give it to Mr. Wheeler, and he will attend to it for me." He further testified that Mr. Dodge said: "'I will give you a check to the amount of $20,000 for some property on Henry street.' I don't remember just what it was. It was about a check for $20,000 for property on Henry street." The same witness testified, further, that Mr. Dodge delivered the check to the claimant, and that after Mr. Dodge's death he heard the following conversation between the claimant and Mr. Wheeler, the executor: "I heard Mrs. Miner say, 'Here is the check which Mr. Dodge gave me on the mortgage, and wished me to give it to you, and also to get it cashed for me.' Mr. Wheeler took the check from Mrs. Miner." Another witness, Sarah Smith, also a servant in the family, testified as follows: "The first conversation about the mortgage was on Saturday night at dinner. He [the testator] came in, and was sitting down and talking over his business, and mentioned about the mortgage on the Henry-Street property, and he said that he had a chance to sell it. I heard this as I was coming out of the pantry." Again, the same witness said: "He [the testator] called her [the claimant] as she was in the middle of the room, and he asked her what did she do with the check for the Henry-Street mortgage; and she says, 'I think I have it with the other papers in my desk.' He said, 'Well, I want you to go and get it, and put it by itself, so that it will not get misplaced, so that, if anything should happen to me, you will know where to put your hand on it.' 'All right,' she said, 'I will go and get it now, and get an envelope to put it in;' and she got an envelope, and put it in that." Another witness, Mrs. Chertizza, testified to a conversation on the same subject, as follows: "I asked him [the testator] if he could not loan me $5,000; that I was in trouble; the mortgage on my house was about to be foreclosed. Mr. Noble needed money, and I had no one else to turn to but Mr. Dodge, as he was my best friend. He said he had just given Mrs. Van Slooten a twenty thousand dollar mortgage on the house, and he could not spare it just then." On the redirect the witness said "he had to pay her the mortgage, and he had no money he could loan me at the present time;" and again he said "he had to give her the mortgage what was on the house; I don't know when he mortgaged the house." Another witness, William Mower, testified as follows: "I had sold a house, and I made the remark to him [the deceased] that I had sold a house, and he said that I should try and get a customer for him. Told me that the house was not paying; that he had lost so much on it. I asked him how much of a mortgage was on it, and he told me twenty thousand dollars. * * * He told me that Mrs. Miner had the mortgage." Subsequently, after the house had been sold, the witness testified to a conversation in May, after Mr. Dodge had had the second attack of paralysis, as follows:

"It was shortly after he had sold his house, and I told him it was a quick transfer,—quicker than the one that I had sold. * * * Then he told he had canceled the mortgage of $20,000 on Henry street, and he was very glad he had sold it. * * * He said that he had canceled that mortgage, and given a check for it of $20,000 to Mrs. Miner, he told me." Another witness, Laura Halstead, testified that in May, 1886, not very long before the testator's death, she saw a check on the claimant's bureau, and that the check was written on one of the bank-notes of Clark, Dodge & Co., and was some time in May, between the first and middle. It was payable to the "order of Mary L. Miner, $20,000. HARRY E. DODGE." The witness further testified that the check was written on a blank like this contained in the testator's check-book on the banking-house of Clark, Dodge & Co. She also stated that she knew Mr. Dodge's handwriting. The testimony of the claimant in respect to the conversation with Mr. Wheeler, the executor, when she delivered him the check after the death of Mr. Dodge, is as follows: "I gave Mr. Wheeler an envelope, with the check in it, that Mr. Dodge gave to me. I told Mr. Wheeler there it was. I gave him the envelope, and I told him what the envelope contained. I told him there was the check that Mr. Dodge had given me, and that Mr. Dodge had told me to give it to Mr. Wheeler, and have Mr. Wheeler attend to it for me. He took the check and went away." She further stated that the check was for $20,000, and its date was between the 7th and 12th of May, and it was in the handwriting of Mr. Dodge. "Mr. Wheeler asked me what was in the envelope, and I said, 'A check that Mr. Dodge gave me for the payment of a mortgage,' and the check was for $20,000." Another witness, Sadie Dye, referring to the same occasion when the claimant gave the check to the executor, testified as follows: "All I heard was, 'Mr. Wheeler, there are the papers that Harry gave me to give to you, and the check which you are to collect.'" The foregoing is substantially the testimony in support of the claim of the plaintiff for $20,000, and, if it stood uncontradicted, it would be sufficient to establish the debt. It is entirely natural, and harmonious with all the known and established facts. There was a bond and mortgage, and there was a check, and the claimant and the deceased were together where they would naturally speak of them, and the persons who gave the testimony were in a position to witness the transactions and conversations which they detail. There is no inherent improbability or impossibility in the testimony, and it is all consistent and free from contradiction, and the cross-examination was endured without variation or contradiction or misstatement. Moreover, there is no intimation derogatory to the character of the witnesses, and they were free from interest in the litigation. Under such circumstances, there is no reason why the testimony is not entitled to respect and belief. It is true the executor contradicted the testimony so far as he could, but its weight was too much to be overcome by the testimony of a single witness. Let us take another view: The claimant held a bond and mortgage against the deceased, which she satisfied about the time he sold the property. After the sale he gave her a check for $20,000, and the only consistent inference is that the check was given for the debt which had been evidenced and secured by the bond and mortgage. It was for the same amount, and given at the same time, and there is no trace of any other transaction or indebtedness between the parties. There is no claim that the check has ever been paid, or that the mortgage debt was paid in any other manner. So we have an indebtedness of the deceased to the claimant of $20,000, without dispute as to its validity. The case, upon the uncontradicted evidence, may be stated thus: The deceased was indebted to the claimant in the sum of $20,000, secured by a bond and mortgage. She satisfied the mortgage without payment of the debt. He then gave her his check for the indebtedness, and the check has never been paid. That leaves the original debt uncanceled, and due and owing, and a valid claim against the estate of

the deceased. In this view, the testimony of the executor denying the receipt of the check from the claimant is neither controlling nor material. The claimant and one of her witnesses says she delivered the check to him in accordance with the instructions of the deceased, and it is to be assumed that she had parted with the paper in some manner; for it was not in her possession at the time of the trial, and the defendant did not deny its custody when called upon to produce it there, but his counsel made the evasive reply already quoted. If he did not receive it, it is lost or mislaid, and, as it was payable to the order of the claimant from an account standing in the name of the deceased at the bank, there is no danger of its payment now, and, as the present claim is based upon the original debt, the failure to produce the check does not affect the case. The only effect of the testimony of the executor is to discredit the evidence of the claimant and her witnesses, and, as we have already seen, the claim is established independently of evidence. In fact it is established independently of the check. With the bond and mortgage established and unpaid, the claim is made out. After a most careful examination, we think both of the claims were established, and should have been allowed. The judgment should be reversed, and a new trial granted. All concur.